**UNITED STATES v. OTTERSBACH.**

No. 657.

District Court, W. D. Washington, N. D.
June 18, 1943.

———o———

J. Charles Dennis, U. S. Atty., and G. D. Hile, Asst. U.S. Atty., both of Seattle, Wash., for plaintiff.

Grosscup, Morrow & Ambler, of Seattle, Wash., for defendant.

BLACK, District Judge.

The United States, as plaintiff, instituted this action for the purpose of revoking and setting aside the order of July 26, 1937, of the United States District Court at Seattle admitting the defendant to American citizenship, and cancelling the certificate of naturalization issued pursuant to such order.

The defendant was born in Germany. Before the First World War he was employed for a considerable time in a government munitions factory in Germany and later served as a machine gunner in the German forces until the close of that war. About 1923 he came to the United States and to Seattle, his wife by a second marriage and his children by the first marriage coming to Seattle from Germany in 1924. His first declaration of intention filed about 1925 expired, according to his statement, by virtue of a misunderstanding. His second declaration of intention was made in 1934. The certificate of naturalization in this proceeding challenged was based upon such second declaration.

In April, 1937, when the defendant filed his petition for citizenship by naturalization, included in the oath which he then swore to was the following: "It is my intention to become a citizen of the United States and to renounce absolutely and forever all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to THE GERMAN REICH of which at this time I am a subject, and it is my intention to reside permanently in the United States."

On July 26, 1937, the defendant in his oath of allegiance swore to the following: "I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to The German Reich of which I have heretofore been a subject (or citizen); that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: SO HELP ME GOD."

In the defendant's deposition, taken by the government before trial and introduced in evidence at the trial, we find the following:

"Q. And when you took the oath to defend the United States you agreed by that oath to go out and fight whoever enemies there might be of the United States, didn't you? A. Yes.

"Q. But you did not intend to fight against Germany, did you? A. Well, I thought that was not included.

"Q. You thought it was not included? A. Yes.

"Q. And you have held back your allegiance so far as fighting against Germany is concerned because you thought it wasn't included? A. That is what I thought. I did not expect anybody would be asked to fight his home country. That is why,—that is what I thought.

"Q. Who told you that? A. I thought it myself.

"Q. You just kept that in your own mind? A. Yes, I kept it in my own mind. I did not think they would expect anybody to fight his own country."

At the trial the defendant did not deny that he had made such statement on his deposition. He tried to excuse himself by stating that there had been no discussion in the citizenship school which he attended of the question whether he would or would not be required to fight as a soldier for the United States against Germany if the Unit-

ed States and Germany should ever be involved in war. And he further said that when he took the oath he did not give a serious thought that enemies of the United States might include relatives. When he was asked directly on his cross-exam. nation near the close of the trial if it had been explained to him at the time he took the oath in 1937 that such meant that he might be required to fight for the United States against his brothers then in Germany, whether he would have agreed to fight against such brothers, he merely said that that was something else.

After the commencement of the Second World War and up to the time of Pearl Harbor, all of the following occurred: On different occasions defendant stated his desire that Germany and Hitler should win; in 1940 or early 1941 he had a framed picture of Hitler in his living room, to which he gave the Nazi salute on at least one occasion; he attended at least four meetings of the Bund which he claimed were social gatherings and which he claimed he attended not as a member but only as a guest because his brother was the Fuehrer or leader of the local Bund; on one such occasion the gathering was addressed by William Kunze, the national leader of the Bund, at which time defendant contributed $12 to a fund intended to help secure the release of the convicted Fritz Kuhn, the former national Bund leader; he subscribed for and received for some months at least the official Bund paper entitled "The American Freeman"; and on more than one occasion he expressed his intention not to work on any parts intended for Boeing bombers inasmuch as they were intended for England for bombing Germany.

All of the foregoing is overwhelmingly established by the evidence and in most respects is admitted by the defendant.

About 1940 on one occasion when an apprentice of his, who is now in the Navy, stated that if he had a chance he would kill Hitler the defendant said that if such apprentice killed Hitler that the defendant would kill the apprentice.

Shortly after the invasion of Norway by Germany the defendant tried to justify to a woman born in Norway the German invasion of the country of her birth. She in anger denounced Hitler and the defendant, also angered, stated in substance that when Hitler came over here she would be in peril.

Some months after Pearl Harbor and in June, 1942, the defendant was interviewed by a member of the F. B. I. and at that time the defendant said that it was necessary to read the German papers as the only way to get the truth as to the European situation; that the German papers carried the truth and the American papers only propaganda. At the same time he said that he would never fight against Germany and that he could not see his way clear to fight against his own brothers and sister. At that time he refused to definitely say whom he wished to be victor, but although the United States was then in the war defendant definitely stated that he did not wish Hitler defeated.

With respect to the question of whether or not he would fight against Germany in June, 1942, he flatly answered: "I would never fight against Germany."

Also, after we had entered the Second World War and about six or seven months after Pearl Harbor when a minute man called upon him in connection with war bonds and asked the defendant at his home if he would buy any, the defendant said he would not and gave as his reason that his brother lived in Cologne and that Cologne had been bombed by many planes.

On January 24, 1943, or almost fifteen months after Pearl Harbor, he signed a written statement in which he admitted that up to the time of his interview by the F. B. I. in June, 1942, he "would not bear arms against Germany". In such statement he further stated: "After talking to the agent on June 29, 1942, I went home to my wife and after a heart to heart talk I saw that my position in not being willing to bear arms against Germany was wrong. If I were able to bear arms at the present time, I would fight for the United States against Germany even on German soil, but I also confess that if I had knowledge that my brother were fighting opposite me and my own bullet might kill him, I would refuse to fight even at the present time."

The defendant produced a number of witnesses, most of whom stated that they considered him a loyal American citizen. But outside of his family none of such witnesses apparently had ever discussed, either before or after Pearl Harbor, the war or Hitler with the defendant or had ever heard the defendant make any statement, either before or after our entry, as to his attitude towards the war. None of them apparently

knew that the defendant had not purchased any bonds or knew that the defendant at any time was unwilling to fight against Germany or that the defendant had ever had a desire, either before or after Pearl Harbor, that Hitler or Germany should win. In fact, practically every witness produced by the defendant, outside his own family, stated that if the defendant after Pearl Harbor were not willing to fight against Germany or had not bought any bonds or did not wish Hitler to lose that they would not consider him a good American. Moreover, his older son stated that he would not consider such an individual to be a good American.

The issues in this case are whether the defendant at the time he took the oath absolutely and entirely intended to renounce and abjure any and all allegiance to the German Reich and whether he, without reservation or evasion, then intended to defend the Constitution and laws of the United States of America against all enemies, foreign and domestic.

There can be no question as to either. The evidence in this case is very clear, cogent and convincing that he intended to do neither although he swore he would do both. Those secret reservations and the concealed German allegiance were still retained by the defendant after Pearl Harbor.

The views of the defendant toward Germany and the war before Pearl Harbor are important in this case as showing a continuity of his attachment and allegiance to Germany from the time he fraudulently became a citizen in 1937 until the time of the trial.

I am completely convinced by clear, cogent and convincing evidence, including the admissions and testimony of the defendant, that his oath of allegiance in 1937 was fraudulent, as was also the oath which he previously took in connection with his petition for citizenship.

There are a number of things to be said in favor of the defendant. He appears to have been a skillful workman, loyal to his family, and generally a good neighbor. Moreover, after Pearl Harbor he did work on bombers. But there is no affirmative evidence that he could, after Pearl Harbor, have secured employment in his trade as a skilled tool and die maker in other than war work.

But in the all-essential requirements as of the date of his naturalization—of complete renunciation of all allegiance to Germany and of willingness to fight for the United States against all enemies of the United States—he completely failed.

As stated in Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 13, 58 L.Ed. 101, the requirements of defendant's oath "plainly contemplated that the applicant, if admitted, should be a citizen in fact as well as in name,—that he should assume and bear the obligations and duties of that status as well as enjoy its rights and privileges." This, the defendant, when he took the oath, had no intention of doing in the event the obligations and duties of American citizenship conflicted with his concealed allegiance to the German Reich.

Ordinarily, the court is confronted in a case of this kind merely with contradictory evidence with respect to certain alleged statements by a defendant years after the oath was taken and from such is required to determine what the defendant's real intention was at the time he took the oath. But in this action the defendant in his own words under oath in his deposition and at the trial established conclusively what his intention was on such critical date. His later statements evidencing his interest in and allegiance to Germany are corroborative of what he says his intention was in 1937.

None of the citations presented by able counsel for defendant touch upon the question involved here. No cases have come to my attention in any wise upholding the right of citizenship under circumstances such as here existed.

If, at the hearing in 1937 when the court admitted him to citizenship, the court had known the things that defendant told us in his deposition, certainly citizenship would not have then been granted.

The defendant, therefore, is not entitled to retain what he did not have the right to receive.

Presentation, upon notice, of findings, conclusions and decree in harmony with the foregoing is requested.